875 So.2d 1168 (2003)
Ulysses BORDERS
v.
CITY OF HUNTSVILLE et al.
1020452.
Supreme Court of Alabama.
July 25, 2003.
Rehearing Denied September 26, 2003.
*1171 Joe N. Lampley and Ta'Kisha L. Guster, Huntsville, for appellant.
George W. Royer, Jr., of Lanier Ford Shaver & Payne, P.C., Huntsville, for appellee the City of Huntsville.
Michael L. Fees and C. Gregory Burgess of Fees & Burgess, P.C., Huntsville, for appellee Keith Earle.
Kenneth Smith, league counsel, for amicus curiae Alabama League of Municipalities, in support of the appellees.
LYONS, Justice.
Ulysses Borders was arrested on charges of disorderly conduct and resisting arrest after an incident at a Huntsville nightclub. He was acquitted of the charges by the Huntsville municipal court. Borders then sued the City of Huntsville ("the City"), Keith Earle, a police officer for the City, and Charles Moore, Sr., the owner of the nightclub.[1] Borders alleged that he was injured when Earle used what Borders says was excessive force to effectuate an allegedly unlawful arrest. Borders asserted against Earle claims of excessive use of force, false arrest, false imprisonment, assault and battery, and malicious prosecution. Borders asserted claims of vicarious liability against the City for Earle's alleged excessive use of force, false arrest, false imprisonment, and assault and battery. Finally, Borders sought compensatory damages and attorney fees pursuant to 42 U.S.C. § 1983 (providing a cause of action for deprivation of constitutional rights by government officials acting "under color of state law"). Borders's § 1983 claims were based on allegations of excessive use of force, false/unlawful arrest, and false imprisonment.
The trial court granted the City's motion to dismiss and entered a summary judgment in favor of Earle. Borders appeals. We affirm in part, reverse in part, and remand.

I. Facts and Procedural History
On July 26, 1998, Borders entered the Club Showcase, a nightclub located at 1806 University Drive in Huntsville, as a patron. *1172 When he entered the nightclub, a dance contest was in progress on an elevated stage. In order to participate in the dance contest, contestants were required to register at the disc jockey's booth. Only persons who had registered as contestants were allowed to be on stage during the dance contest.
Approximately five security guards were positioned in various locations around the nightclub. Three of the security guards wore black T-shirts with the word "security" in white letters. The other two security guards, Earle and Lewis Hall, both fulltime police officers for the City, were working as part-time security guards at the nightclub. They were wearing their police uniforms, which included a badge and a gun belt. Earle was positioned at the back of the stage and another security guard, Calvin Bell, was positioned at a corner of the stage near the audience. The security guards were responsible for keeping unauthorized personspersons who were not participants in the dance contestoff the stage. Earle, who had worked at the nightclub for approximately three months, served as the last line of protection against unauthorized persons who had gotten past the other security guards in their attempt to enter the stage.
After Borders entered the nightclub, he recognized an acquaintance, Moses Eze, dancing on the stage with a female partner. Eze had previously dated Borders's sister and was the father of her child. At the time of the incident at the nightclub, Eze was allegedly no longer involved in a relationship with Borders's sister. Borders testified that he did not feel any "hostility" toward Eze and that there were no "bad feelings" between them. Marin Childress, the person who had accompanied Borders to the nightclub, testified that Borders told him that he felt like Eze was being "disrespectful" by dancing onstage with a female partner. Borders, who was not registered as a dance contestant, approached the stage. The evidence is disputed as to what happened next.
Borders testified that he got on the stage to talk to Eze, who was standing toward the back of the stage. One of the security guards approached Borders and questioned him about being on stage. Borders did not remember the security guard's name; however, other witnesses testified that it was Bell. According to Borders, Bell agreed to let him speak to Eze. Eze testified that he did not witness Borders attempt to strike Bell or raise his arms while he was talking to Bell. At some point while Borders was onstage, the disc jockey announced that Borders should leave the stage.
Eze testified that Borders approached him and told him to stop seeing his sister. Borders testified that after he had spoken with Eze and as Borders was leaving the stage, Earle pushed him from behind, causing Borders to fall into the crowd. The crowd caught him and pushed him back onstage. Borders testified that Earle then began to choke, kick, and punch him; he stated that other security guards were also involved in the beating. Borders stated that after the alleged attack the following occurred:
"[Officer] Earle picked me up, grabbed me by the back of my shirt, pulled me up by my shirt, then he turned me around, handcuffed me, then he walked me going like down the steps. And when I was on the way going out the door, ... he slammed me into the car, smacked me in the back of my head and in my face, and then threw me into the car and told me he should have killed me."
Borders testified that he never tried to strike Earle during or after the incident. Eze and Latasha Pride, a 14-year-old who *1173 was sitting on the stage at the time of the incident, both testified that Borders did not attempt to strike anyone onstage before Earle pushed him from behind. Childress also testified that after Borders whispered something to Eze, a police officer pushed Borders off the stage for no apparent reason.
Earle presents a dramatically different version of the events. Earle testified that when Borders got on the stage he pushed Bell out of his way and headed toward Eze. During Earle's testimony at Borders's criminal trial before the municipal court, he testified that Borders started yelling at Eze as he approached him. Earle testified that he then approached Borders to intercept a punch, which he says was aimed at Eze. Earle testified:
"As I grabbed [Borders] and tried to take him off the stage, that's when [Borders] jerked away from me and pushed off on me. My first reaction was to push him to get him back off from me. At that time, we were at the stage. What footage we were at the stage, I don't know. [Borders] did leave the stage and go into the crowd. The crowd did catch [Borders] and throw him back on to the stage. He wasn't in a, I guess, the force from the crowd from him hitting the stage was not enough from him to make contact back with me and both of us [fell] to the ground.
"[Borders] went up under me, locked his arms around my legs in order to try to pick me up. He can't. I'm 260 pounds. He wasn't going to pick me up. What he was going to try to do was throw me off balance onto my back.
"At that point, I grabbed [Borders]. We went to the ground. I tried to arrest him and we went fighting. I told him the timethe first time I told him that he was under arrest for the disorderly conduct for fighting with the security guard that tried to get him off the stage in the first place.
"The second time is when [Borders] went over to [Eze who] was dancing with the girl and tried to attack him. And at that point whenever I tried to get him off of me and tried to get him under arrest and when he pushed off of me and I pushed him back, that was enough for disorderly conduct.
"When the resisting arrest came into play is whenever I had to physically fight him whenever he was put back on to the stage. We started from one side of the stage. About the time the other officer, which was Officer David Long, which is a Triana police officer, that was also there off dutyhe was on the stage back here. He had enough time to come from the backstage, come upstairs, and assist me in arresting him. At that point, yes, he had bruises on him. He had bruises on his head. He had bruises on his back. Because in order for us to place him under arrest, we're going to have to use physical force. So he's not going to come out looking pretty."
Earle testified that he told Borders to leave the stage and that he was under arrest when he saw Borders approaching Eze. However, during his deposition, Earle could not recall whether Borders tried to hit Eze. He testified that Borders pushed by him to get to Eze and that a "scuffle" occurred between Borders and Eze.
Bell's version of the events was similar to the testimony given by Earle. Bell testified:
"Once [Borders] was on the stage, I approached him from the side, asked him to get off, and reached for his arm. At that point, [Borders] pushed me out of his way, causing me to stumble backwards, and [Borders] continued moving toward [Eze].

*1174 "As [Borders] passed by me and was approaching [Eze], he began yelling at [Eze] in a [sic] angry tone of voice. Having obviously seen what was occurring, Officer Earle quickly moved across the stage to stop [Borders]. When Officer Earle attempted to grab and control [Borders], [Borders] jerked away and pushed himself free from Officer Earle, heading toward the edge of the stage. Officer Earle approached and made contact with [Borders] again, at which point [Borders] seemed to lose his balance and appeared to be falling off the stage. However, several members in the audience who were standing near the edge of the stage pushed [Borders] back on the stage, causing him to land in front of Officer Earle at his feet. [Borders] lunged toward Officer Earle, wrapped his arms around Officer Earle's legs, and appeared to try to take Officer Earle's feet out from under him. Officer Earle grabbed hold of [Borders] and fell on top of him in order to gain control. While Officer Earle and Borders were on the floor of the stage, [Borders] was fighting with Officer Earle, thrashing his arms and legs around, and refusing to submit to arrest by Officer Earle. By this time, Officer [Lewis] Hall, the other security guards, and I had rushed over to assist Officer Earle with [Borders]. Also, there were approximately 10 to 20 people from the audience who had jumped onto the stage and were standing nearby watching. The struggle ended when Officer Earle, with the assistance of Officer Hall, the other security guards, and myself, [were] able to handcuff [Borders]. At that point, [Borders] was lifted off the floor of the stage by Officer Earle and was escorted outside the Club Showcase where he was placed in the backseat of Officer Earle's patrol car.
"During the entire incident, Officer Earle never kicked, struck, or otherwise physically abused [Borders], nor did Officer Earle use any force that I regarded as being unnecessary or improper under the circumstances given [Borders's] aggressive and hostile resistance."
James Keith, another security guard working at the nightclub that night, testified at Borders's criminal trial that he also witnessed Borders push away from Earle. According to Keith, Earle then pushed Borders away from him, which resulted in Borders's falling off the stage. Lewis Hall, the other off-duty police officer at the nightclub, testified that he witnessed a physical altercation between Earle and Borders. Hall testified that he witnessed Borders grab Earle's legs in what appeared to be an attempt to tackle Earle after he fell from the stage and was pushed back onstage.
The City filed a motion to dismiss Borders's complaint on the basis that pursuant to § 11-47-190, Ala.Code 1975, and § 6-5-338, Ala.Code 1975, the City was immune from all claims alleged in the complaint. The trial court granted the motion and dismissed Borders's claims against the City. Borders then filed two motions for "reconsideration"; the trial court denied both.
Earle filed a summary-judgment motion, as well as a summary of undisputed facts, a brief, and evidentiary material including the deposition testimony of Borders, Pride, Eze, and Earle; the affidavit testimony of Bell and Hall; and the transcript of Borders's criminal trial before the municipal court. Borders opposed the summaryjudgment motion and filed evidentiary material supporting his claims. The trial court entered a summary judgment in Earle's favor.
Borders then filed what he called a "Motion to Set Aside All Orders Entered and *1175 Motion to Recuse," alleging that the trial judge was disqualified from sitting in the present case; the judge denied those motions. Borders appealed from the judgments in favor of the City and Earle and from the order denying his postjudgment motions.

II. Jurisdiction
The City and Earle argue that this Court has jurisdiction to consider only the issues raised in Borders's "Motion to Set Aside All Orders Entered and Motion to Recuse." The gravamen of the motion is that the trial judge was disqualified from sitting in this case because he served as a state senator during the time the Legislature enacted § 6-5-338 and amended § 11-47-190, both of which statutes form the basis of the City and Earle's immunity claims. The City and Earle contend that the motion was not a proper motion under Rule 59(e), Ala. R. Civ. P., because it did not address the merits of the trial court's judgments in their favor, but instead, it raised for the first time a collateral objection that the trial judge was disqualified because of an alleged judicial bias. Therefore, according to the City and Earle, the motion was actually "an attack on the judgment itself," made pursuant to Rule 60(b)(6), Ala. R. Civ. P., and the filing of the motion did not extend the 42-day period for the filing of an appeal to this Court. Alabama Farm Bureau Mut. Cas. Ins. v. Boswell, 430 So.2d 426, 428 (Ala.1983) (Rule 60(b)(6) motion "does not affect the finality of the judgment or toll the time for appeal"); Smith v. Clark, 468 So.2d 138 (Ala.1985) (affirming the trial court's denial of a Rule 60(b) motion alleging that the trial judge had a conflict of interest in the case). The City and Earle point out that Borders's notice of appeal was filed more than 42 days after the date of the final judgment entered by the trial court. Therefore, the City and Earle argue, Borders's notice of appeal was untimely. We disagree.
In determining how to proceed under the Alabama Rules of Civil Procedure, we must look to the essence of a motion rather than to its title. Ex parte Johnson, 715 So.2d 783, 785 (Ala.1998). In his postjudgment motion, Borders requested that the trial judge set aside his orders and recuse himself from the case. Both requests were based upon an alleged conflict of interest on the part of the trial judge. A motion seeking a judge's recusal, if granted, could require that the trial court's judgment be vacated. See Smith, 468 So.2d at 141 ("Indeed, a judgment is not void because of disqualification of a judge, but is only voidable on direct attack by appeal or by motion to set it aside.").
The City and Earle correctly argue that seeking a trial judge's recusal is a proper function of a Rule 60(b)(6) motion. See Acromag-Viking v. Blalock, 420 So.2d 60 (Ala.1982). However, this Court has also construed a motion to recuse as a motion properly filed under Rule 59. In Johnson v. Life Insurance Co. of Alabama, 581 So.2d 438 (Ala.1991), the plaintiffs filed a Rule 59 motion for a new trial; that motion referenced their pending motion for recusal as a ground for a new trial. Both motions were deemed denied under Rule 59.1, Ala. R. Civ. P., because the trial court failed to rule on the motions within 90 days. 581 So.2d at 440.
In the present action, we construe Borders's request for the trial judge to set aside all orders and recuse himself as proper functions of a Rule 59 motion to alter, amend, or vacate the judgment. Because Borders filed his notice of appeal within 42 days after the trial court denied his postjudgment motion, his appeal is timely. See Rule 4(a)(3), Ala. R.App. P. (the time for a filing of appeal shall be *1176 computed from the date the trial court denies the Rule 59 motion). See also Hamid v. Price Waterhouse, 51 F.3d 1411 (9th Cir.1995), in which the court treated a motion to vacate a judgment on the ground that the trial judge should have recused himself as a motion under Fed.R.Civ.P. 59 and then concluded that the time in which to appeal did not begin to run until the entry of an order disposing of the motion to vacate the judgment.[2]

III. Borders's Postjudgment Motions
Whether to grant or deny a postjudgment motion filed pursuant to Rule 59 is within the sound discretion of the trial court. Flagstar Enters., Inc. v. Foster, 779 So.2d 1220 (Ala.2000). We will not disturb the exercise of that discretion unless the trial court exceeded the permissible limits of its discretion. Flagstar, 779 So.2d at 1221; Comalander v. Spottswood, 846 So.2d 1086 (Ala.2002).
Borders argues that the trial judge should have disclosed to all parties the fact that he voted in favor of the enactment of the bill that would become § 6-5-338 and the amendment of § 11-47-190 during his term as a state senator because the basis of this action involves the trial judge's interpretation of both statutes. As the basis for his argument, Borders cites Canons 1, 2, and 3 of the Alabama Canons of Judicial Ethics; he specifically alleges that the trial judge's conduct violates Canon 3.C.(1), which provides that "[a] judge should disqualify himself in a proceeding in which his disqualification is required by law or his impartiality might reasonably be questioned...."
The City and Earle initially argue that Borders waived the right to raise the issue of the trial judge's disqualification because he raised the issue for the first time in a postjudgment motion, citing Ross v. Luton, 456 So.2d 249 (Ala.1984). Because we conclude that Borders's recusal ground lacks merit, we proceed without a discussion of whether the issue was waived.
In In re Sullivan, 283 Ala. 514, 523, 219 So.2d 346, 353 (1969), this Court stated, "A judge is not disqualified to try a case because he had been a member of the legislature enacting a statute involved in [the] litigation before him...." In Sullivan, this Court held that the fact that some members of the Board of Commissioners of the Alabama State Bar were members of the Board when the rule in question was formulated did not disqualify the members to sit in the disbarment proceedings at issue in that case. 283 Ala. at 523, 219 So.2d at 353. Therefore, under Sullivan, the trial judge here was not disqualified to sit in the proceedings because he was a state senator when the Legislature enacted and amended the statutes upon which the City and Earle base their immunity claims. The trial court did not exceed the permissible limits of its discretion in denying Borders's motion to recuse; therefore, we affirm the order denying that motion.
Borders's motion to set aside the judgment, to the extent it also attacks the judgment on its merits, states no specific grounds other than the aforementioned recusal. We therefore address the remaining issues in the context of Borders's appeal from the judgment dismissing his claims against the City and from the summary judgment in favor of Earle.

IV. State-Law Claims Against Earle

A. Standard of Review
Our review of a summary judgment is de novo. "A motion for summary *1177 judgment is granted only when the evidence demonstrates that `there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' Rule 56(c), Ala. R. Civ. P." Reichert v. City of Mobile, 776 So.2d 761, 764 (Ala.2000). We apply "the same standard as that of the trial court in determining whether the evidence before the court made out a genuine issue of material fact." Bussey v. John Deere Co., 531 So.2d 860, 862 (Ala.1988); System Dynamics Int'l, Inc. v. Boykin, 683 So.2d 419, 420 (Ala.1996). In order to defeat a properly supported motion for a summary judgment, the nonmoving party must present substantial evidence that creates a genuine issue of material fact. "Substantial evidence" is "evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved." West v. Founders Life Assurance Co. of Florida, 547 So.2d 870, 871 (Ala.1989).

B. The Availability to an Officer of Discretionary-Function Immunity when the Arrestee is Acquitted
Borders was acquitted of the charges for which Earle arrested him without a warrant. Borders argues that the trial court's summary judgment in favor of Earle was improper because, he says, the evidence established the existence of genuine issues of material fact as to whether Earle actually witnessed Borders commit a crime when Borders entered the stage, spoke with Eze, and/or exited the stage. In his reply brief,[3] Borders argues that Earle "never witnessed, viewed or observed the commission of a crime and is simply trying to hide under the wide umbrella of discretionary function immunity."
Earle argues that all of Borders's claims are barred by the discretionary-function immunity afforded to peace officers pursuant to § 6-5-338. Section 6-5-338(a) provides:
"(a) Every peace officer, except constables, who is employed or appointed pursuant to the Constitution or statutes of this state, whether appointed or employed as such peace officer by the state or a county or municipality thereof, or by an agency or institution, corporate or otherwise, created pursuant to the Constitution or laws of this state and authorized by the Constitution or laws to appoint or employ police officers or other peace officers, and whose duties prescribed by law, or by the lawful terms of their employment or appointment, include the enforcement of, or the investigation and reporting of violations of, the criminal laws of this state, and who is empowered by the laws of this state to execute warrants, to arrest and to take into custody persons who violate, or who are lawfully charged by warrant, indictment, or other lawful process, with violations of, the criminal laws of this state, shall at all times be deemed to be officers of this state, and as such shall have immunity from tort liability arising out *1178 of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."

(Emphasis added.) Earle argues that he is entitled to the immunity provided in § 6-5-338 because, he says, he was performing a discretionary function in determining whether there was probable cause to arrest Borders and in choosing the manner in which to effectuate the arrest.
As a police officer, Earle qualifies as a peace officer for purposes of § 6-5-338. It is also undisputed that at all times during the incident in question Earle was acting within his capacity as a police officer of the City. To come within the protection of § 6-5-338, a municipal police officer must be engaged in a discretionary function with respect to the incident in question. See Ex parte City of Montgomery, 758 So.2d 565 (Ala.1999); Ex parte Duvall, 782 So.2d 244 (Ala.2000). Discretionary-function immunity, as is the case with State-agent immunity,[4] is withheld if an officer acts with willful or malicious intent or in bad faith. See City of Montgomery, 758 So.2d at 569. Borders states in his reply brief that he "has never contended that Earle's conduct was done in malice, bad faith or with willfulness." Instead, Borders contends that Earle's conduct was actionable because of his "neglect, carelessness, or unskillfulness while acting in the line and scope of his duties." Borders's reply brief at p. 13. Therefore, in order to decide whether Earle is immune from liability in this action, we need determine only whether he was performing a discretionary function with respect to the incident in question. See Couch v. City of Sheffield, 708 So.2d 144, 153 (Ala. 1998).
Generally, arrests and attempted arrests are classified as discretionary functions. Telfare v. City of Huntsville, 841 So.2d 1222 (Ala.2002). "Discretionary functions" are broadly defined as "`"those acts as to which there is no hard and fast rule as to the course of conduct that one must or must not take and those acts requiring exercise in judgment and choice and involving what is just and proper under the circumstances."'" Ex parte Duvall, 782 So.2d at 248 (quoting City of Montgomery, 758 So.2d at 569, quoting in turn Wright v. Wynn, 682 So.2d 1, 2 (Ala.1996)).
Borders claims that Earle's arrest of Borders for the commission of a misdemeanor was unlawful because, he argues, his subsequent acquittal establishes conclusively that Earle could not have witnessed Borders commit any crime. Borders cites Telfare, supra, for the proposition that an officer is not entitled to discretionary-function immunity for the arrest of a person for a misdemeanor offense not committed in the presence of the arresting officer. Rule 4.1, Ala. R.Crim. P., and § 15-10-3, Ala Code 1975, read in para materia, provide, among other things, that an officer may effectuate a lawful arrest of a person for any offense if the offense was committed in the arresting officer's presence. In Telfare, this Court stated that "[g]enerally, Alabama's Rules of Criminal Procedure and [§ 15-10-3(a), Ala. *1179 Code 1975,] do not allow law-enforcement officers the discretion to arrest alleged wrongdoers for misdemeanors not committed in the presence of the arresting officer." 841 So.2d at 1229.
In Telfare, an arresting officer arrived on the scene after an alleged misdemeanor offense had occurred. 841 So.2d at 1224. The officer then arrested the alleged offender, Telfare, on charges of disorderly conduct, harassment, and resisting arrest. 841 So.2d at 1225. In a subsequent civil action against the arresting officer and the City of Huntsville, Telfare claimed that the arresting officer was not engaged in a discretionary function entitling him to immunity because the alleged misdemeanor was not committed in the presence of the arresting officer pursuant to Rule 4.1 and § 15-10-3(a), Ala.Code 1975. 841 So.2d at 1228-29. We agreed with Telfare and reversed the ruling in favor of the City on the motion to dismiss with respect to Telfare's state-law claims because there was no evidence indicating that the arresting officer was pursuing a discretionary function, i.e., effectuating a lawful arrest. The City in Telfare failed to demonstrate that it was entitled to immunity under § 6-5-338 for the officer's actions. 841 So.2d at 1229.
In Telfare, because the officer was not present at the scene at the time of the events made the basis of the charge, factual issues as to the conduct of the arrestee at the time of the warrantless arrest were not relevant. If the evidence as to Borders's conduct undisputedly reflected that Borders had committed a misdemeanor in Earle's presence, it would logically follow that Earle would be entitled to discretionary-function immunity. However, under such a circumstance, the ensuing conviction would prevent the issue of immunity from ever being presented. See Telfare, 841 So.2d at 1230 (Houston, J., concurring in part and dissenting in part) ("If the doctrine of discretionary authority in a case involving an alleged illegal arrest is coextensive with, and determined by, the question whether the officers effectuating the arrest had probable cause to arrest, then the issue of immunity would never come into playthe liability of the officer, and, thus, what immunity he enjoys, would simply be conclusively determined by whether the officer had committed a tort by arresting without probable cause.").
The City, Earle, and amicus curiae Alabama League of Municipalities ask us to resolve the issue whether an arresting officer must have probable cause for an arrest before the officer can be entitled to discretionary-function immunity under § 6-5-338 and to embrace the concept of "arguable probable cause" as sufficient to permit Earle to assert the defense of immunity, because the criminal charges against Borders have been dismissed. While Telfare is distinguishable, the present case requires us to deal with an issue not presented in Telfarewhether a peace officer making a warrantless arrest on a charge based upon conduct the officer witnessed is entitled to discretionary-function immunity in a subsequent civil action after the arrestee is acquitted.
In Micalizzi v. Ciamarra, 206 F.Supp.2d 564, 576 (S.D.N.Y.2002), the district court, citing Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir.1997), and Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), recognized the concept of "arguable probable cause" giving rise to qualified immunity when an officer makes an arrest lacking probable cause if officers of reasonable competence in the same circumstances and with the same knowledge would disagree as to whether probable cause existed. Although this Court has not directly addressed the issue of the relationship between probable *1180 cause and discretionary-function immunity, we agree that the standard of "arguable probable cause" should govern further proceedings in this case. See City of Montgomery, 758 So.2d at 570 (because there is no "hard and fast rule" regarding whether actual probable cause exists to make an arrest, an officer is entitled to discretionary-function immunity for exercising his or her judgment in whether to make an arrest); Duvall, 782 So.2d at 248 ("There is no hard and fast rule concerning when there is probable cause to arrest a person pursuant to § 32-5A-4, Ala.Code 1975, for refusing to comply with a lawful order or direction of a police officer."); Telfare, 841 So.2d at 1230 (Houston, J., concurring in part and dissenting in part and concluding that the issue in such a case is not whether probable cause existed, but whether, at the time of the arrest, the officer was engaged in a discretionary function).
Embracing the concept of arguable probable cause, however, does not end the inquiry. The district court denied the summary-judgment motion in Micalizzi because, under the evidence, when viewed most favorably to the plaintiff, "no reasonable police officer could have believed that he had probable cause to arrest plaintiff." 206 F.Supp.2d at 576. We must determine whether the same can be said of this case. If so, a jury question exists as to whether Earle acted with arguable probable cause, and the summary judgment must be reversed. If not, the summary judgment for Earle must be affirmed.

C. Whether, as a Matter of Law, Officers of Reasonable Competence in the Same Circumstances and with the Same Knowledge Would Disagree as to Whether Probable Cause Existed
We begin with the initial alleged altercation between Bell and Borders after Borders got on the stage. Earle testified during Borders's criminal trial that he witnessed Borders "fighting" with Bell. In his deposition testimony, Earle stated that he saw Borders push Bell's arm or his chest, causing Bell to lose his balance. Earle testified that it was at this point he believed he had probable cause to arrest Borders for harassment or disorderly conduct. Bell's testimony corroborates that of Earle. However, Borders testified that he did not make physical contact with Bell; he testified that Bell actually allowed him to pass and to continue along his way to speak to Eze. Eze, Pride, and Childress[5] all testified that they did not see any altercation between Borders and Bell.
Next, Earle testified that as Borders proceeded to approach Eze he was yelling and pointing at Eze. At this point, Earle's own testimony is conflicting. During Borders's criminal trial, Earle testified that he saw Borders "attack" Eze and swing at him. However, during his deposition testimony, Earle stated that he could not recall whether Borders attempted to strike Eze. Earle testified that Borders acted aggressively and extended his hands toward him in a manner that indicated to him that Borders was pushing him out of his way in order to reach Eze. Earle testified that it was at this point that he told Borders to leave the stage and that he was under arrest. Then, Earle testified that he and Borders got into a "scuffle," which resulted in Borders's falling off the stage. Earle testified that he did not push Borders off the stage into the crowd.
Borders testified that he was not acting aggressively when he approached Eze to have a conversation with him. Eze also testified that Borders approached him to tell him something regarding his relationship with Borders's sister. Eze testified *1181 that Borders was not acting in an aggressive manner and that Borders never tried to swing at him. Keith, a security guard at the nightclub, also testified that he did not see Borders engage in a fight with any patron at the nightclub.[6]
Eze testified that Earle approached Borders, but that he could not hear what he said to him because the music was too loud. Then, according to Eze, Borders started to walk off the stage, and Earle pushed him from behind, causing him to fall off the stage. Borders testified that his first encounter with Earle was when he pushed him from behind into the crowd. Pride and Childress also testified that they saw Earle push Borders from behind.
Finally, the last phase of the incident involves the point at which the crowd pushed Borders back onto the stage. This fact is undisputed. However, Bell and Earle testify that when Borders was pushed back onstage by the crowd, he grabbed Earle's leg. Earle testified that he interpreted Borders's action as an attempt to throw him off balance. At this point, Earle testified that he went down on top of Borders and was assisted by other officers and security guards in arresting Borders. Earle testified that he escorted Borders from the nightclub in handcuffs.
Borders testified that he was off balance when he was pushed back onstage, and that at that point Earle and other guards began punching and kicking him. He testified that Earle was on top of him and that Earle began choking him. Borders stated that Earle "smacked [him] in the face and told [him] he should have killed [him] and threw [him] in the backseat of the car."
Viewing the evidence in the light most favorable to Borders, as we are required to do in reviewing a summary judgment,[7] we cannot determine, as a matter of law, that Earle was engaged in a discretionary function when he arrested Borders, that is, that Earle had arguable probable cause in that officers of reasonable competence in the same circumstances and with the same knowledge would disagree as to whether probable cause existed.
According to Borders, he did approach the stage even though he was unauthorized to be on the stage during the dance contest. But he says Bell allowed him to proceed across the stage so that he could talk to Eze. Borders then spoke with Eze and began to walk off the stage. At this point, according to Borders, Earle came from behind him and pushed him off the stage. When Borders was pushed back onto the stage by the crowd, Earle began beating him and then arrested him. Therefore, evidence was presented to the trial court that contradicted Earle's evidence of the events that occurred before Earle effectuated his arrest of Borders. Compare Couch, 708 So.2d at 153-54 (police officer was entitled to discretionaryfunction immunity when no evidence disputed the officer's affidavit that "he believed" he had probable cause to effectuate the arrest).
In Franklin v. City of Huntsville, 670 So.2d 848 (Ala.1995), an officer repeatedly asked Franklin, a spectator at a highschool football game, to leave a certain restricted area and move to the bleacher section of the stadium. Franklin did not follow the officer's orders. 670 So.2d at *1182 849-50. The officer then grabbed Franklin's arm and placed him under arrest for disorderly conduct. 670 So.2d at 850. Apparently, the area where Franklin was standing was usually "chained off" and "kept clear in order to minimize the potential for fights." 670 So.2d at 850. Franklin was aware that he was in the unauthorized area; however, he stated that he thought it was not restricted because it had not yet been "chained off." 670 So.2d at 850. Based upon a review of the record, this Court concluded that disputed facts such as whether Franklin was cursing and attracting the attention of other spectators and whether he was standing in an unauthorized zone presented a jury question. 670 So.2d at 853. This Court reversed the summary judgment in favor of the arresting officer because disputed issues of fact existed as to whether the officer had probable cause to arrest Franklin. 670 So.2d at 853.
In the present action, as in Franklin, the facts are disputed as to the conduct of the arrestee and the officer. Such disputed facts preclude a determination as to whether Earle was engaged in a discretionary function and instead present a jury question.[8] The trial court's summary judgment in favor of Earle was improper. We therefore reverse the summary judgment in favor of Earle with respect to Borders's claims that Earle used excessive force and his claims of false arrest, false imprisonment, and assault and battery.
However, as to Borders's claim of malicious prosecution against Earle, we affirm the summary judgment on the basis of Borders's disclaimer in his reply brief for any liability arising out of Earle's intentional conduct. In order to succeed in a malicious-prosecution action, a plaintiff must prove, among other things, that "`a prior judicial proceeding was instigated by the present defendant without probable cause and with malice.'" Mitchell v. Folmar & Assocs., LLP, 854 So.2d 1115 (Ala. 2003) (quoting Fina Oil & Chem. Co. v. Hood, 621 So.2d 253, 256 (Ala.1993)) (emphasis added). See also Delchamps, Inc. v. Bryant, 738 So.2d 824, 834 (Ala.1999) (liability for malicious prosecution is not "within the traditional categories of `neglect, carelessness or unskillfulness'"). Borders absolves Earle of any liability for intentional conduct; instead, he contends that Earle's conduct was based on his neglect, carelessness, or unskillfulness. Such conduct does not support an action for malicious prosecution, and we affirm the summary judgment with respect to that claim.

V. State-Law Claims Against the City

A. Standard of Review
In Nance v. Matthews, 622 So.2d 297 (Ala.1993), this Court stated the standard of review applicable to a motion to dismiss:
"On appeal, a dismissal is not entitled to a presumption of correctness. The appropriate standard of review under Rule 12(b)(6) is whether, when the allegations of the complaint are viewed most strongly in the pleader's favor, it appears that the pleader could prove any set of circumstances that would entitle [it] to relief. In making this determination *1183 this Court does not consider whether the plaintiff will ultimately prevail, but only whether [it] may prevail. We note that a Rule 12(b)(6) dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief."
622 So.2d at 299 (citations omitted).

B. Vicarious Liability
Because we find that Earle is not entitled to discretionary-function immunity at this stage in the proceedings, we also conclude that the City is not entitled to discretionary-function immunity under the principle of respondeat superior. Moreover, if Earle is not entitled to immunity pursuant to § 6-5-338(a), the plain language of the statute withholds immunity from the City. See Ex parte City of Gadsden, 781 So.2d 936 (Ala.2000), recognizing that when the employee of a municipality is immune § 6-5-338(b) extends the immunity to the municipality.

C. Substantive Immunity
The City also argues that it is entitled to substantive immunity created in Rich v. City of Mobile, 410 So.2d 385 (Ala.1982) (providing immunity "in those narrow areas of governmental activities essential to the well-being of the governed, where the imposition of liability can be reasonably calculated to materially thwart the City's legitimate efforts to provide such public services"). Substantive immunity has been extended to the context of police activities. See Calogrides v. City of Mobile, 475 So.2d 560 (Ala.1985); Garrett v. City of Mobile, 481 So.2d 376 (Ala.1985). However, in City of Birmingham v. Benson, 631 So.2d 902, 905 (Ala.1993), this Court refused to extend substantive immunity for the death of a patron outside a bar to the City of Birmingham when an offduty police officer acting as a security guard at the bar was present on the scene and in a position to control an aggressor. Based on Benson, we cannot find that the imposition of liability upon the City under the circumstances presented here will "materially thwart" the City's legitimate efforts to provide public services. See Benson, 631 So.2d at 905.

D. Liability for Intentional Conduct
The City also argues that it is entitled to immunity under § 11-47-190, Ala.Code 1975, for Borders's intentionally based tort claim of false imprisonment. Section 11-47-190 "absolves a city from liability for an intentional tort committed by one of its agents...." Ex parte City of Gadsden, 718 So.2d 716, 721 (Ala.1998). In his complaint, Borders asserted a vicarious-liability claim against the City based upon his contention that Earle "knew or should have known" that Borders's detention, restraint, and imprisonment were unlawful. Although it is unclear from the complaint whether Borders actually asserts vicarious liability for an intentional tort against the City, he contends in his reply brief that his allegations are all based upon the "neglect, carelessness, or unskillfulness" of Earle. In Franklin, supra, we stated in the context of claims for assault and battery, false imprisonment and false arrest, that "where a plaintiff alleges a factual pattern that demonstrates `neglect, carelessness, or unskillfulness' the plaintiff has stated a cause of action under Ala.Code 1975, § 11-47-190." 670 So.2d at 852. Therefore, the City is not immune from liability pursuant to § 11-47-190 for Borders's claims of excessive use of force, false arrest, false imprisonment, and assault and battery, all of which are based upon Earle's alleged neglect, carelessness, and unskillfulness. Borders stated claims upon which relief could be granted; therefore, the trial court improperly dismissed *1184 Borders's claims against the City that were based upon proof of negligence, i.e., Borders's claims of excessive use of force, false arrest, false imprisonment, and assault and battery. We reverse the trial court's dismissal with respect to the foregoing claims.

VI. Federal-Law Claims Against the City and Earle
Borders did not address his asserted claims under 42 U.S.C. § 1983 in his briefs on appeal to this Court. Therefore, he waived any issue related to those claims on appeal because the "`failure to argue an issue in brief to an appellate court is tantamount to the waiver of that issue on appeal.'" Harris v. Gill, 585 So.2d 831, 835 (Ala.1991) (quoting Ex parte Riley, 464 So.2d 92, 94 (Ala.1985)). We affirm the summary judgment in favor of Earle and the ruling in favor of the City on the motion to dismiss with respect to Borders's § 1983 claims.

VII. Conclusion
We affirm the trial court's denial of Borders's motion to recuse. We affirm the trial court's summary judgment in favor of Earle as to Borders's malicious-prosecution claim. We affirm the summary judgment in favor of Earle and the ruling on the motion to dismiss in favor of the City as to the § 1983 claims. We reverse the trial court's summary judgment in favor of Earle and its ruling on the motion to dismiss in favor of the City with respect to Borders's claims alleging excessive use of force, false arrest, false imprisonment, and assault and battery to the extent these claims are based on negligence. We remand the cause for further proceedings consistent with this opinion.
AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
HOUSTON, JOHNSTONE, HARWOOD, and WOODALL, JJ., concur.
MOORE, C.J., and SEE, BROWN, and STUART, JJ., concur in part and dissent in part.
MOORE, Chief Justice (concurring in part and dissenting in part).
I concur with that portion of the majority opinion that affirms the trial court's summary judgment, the denial of the motion to recuse, and its order granting the City's motion to dismiss. However, I must dissent from the reversal of any portion of the trial court's summary judgment and its ruling on the City's motion to dismiss. First, I disagree with the majority's analysis of probable cause and its application of Micalizzi v. Ciamarra, 206 F.Supp.2d 564 (S.D.N.Y.2002). It also seems that the majority has judged the officer's actions too strictly and without due regard for the immunity offered by § 6-5-338, Ala.Code 1975, or for the threat that Borders's actions posed to other people on the dance floor when he was arrested for disorderly conduct and resisting arrest.
The trial judge had the best opportunity to view the evidence and to judge the credibility of the witnesses and the weight to be accorded the evidence. Therefore, I respectfully dissent.
SEE, Justice (concurring in part and dissenting in part).
I concur with the holdings in the main opinion that Ulysses Borders's posttrial motion is properly characterized as a Rule 59(e), Ala. R. Civ. P., motion and that the trial judge was not required to recuse himself. I also concur in the holding that the proper standard for determining whether an arresting officer is entitled to discretionary-function immunity under § 6-5-338, Ala.Code 1975, for a misdemeanor arrest is not whether probable cause existed, *1185 but, rather, whether the officer had "arguable probable cause." Micalizzi v. Ciamarra, 206 F.Supp.2d 564, 576 (S.D.N.Y.2002) (citing Lee v. Sandberg, 136 F.3d 94, 102 (2d Cir.1997), and Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). I further concur with the main opinion's affirmance of the trial court's summary judgment in favor of Earle as to Borders's maliciousprosecution claim, and I concur in the main opinion's affirmance of the trial court's summary judgment in favor of Earle and its grant of the City's motion to dismiss with respect to Borders's claims made pursuant to 42 U.S.C. § 1983. I dissent, however, from the main opinion insofar as it holds that there remained a genuine issue of material fact as to whether there was arguable probable cause in this case. In Micalizzi the court denied a motion for a summary judgment because "no reasonable police officer could have believed that he had probable cause to arrest plaintiff." 206 F.Supp.2d at 576. Given the testimony regarding the events leading to Borders's arrest, a reasonable police officer in Earle's position, charged with maintaining order at a dance club, could have believed that he had probable cause to arrest Borders.
Providing immunity to police officers, not just from ultimate liability but also from the hardships of a trial, allows the officers to perform their public duties to the fullest. "One of the purposes of immunity, absolute and qualified, is to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." Siegert v. Gilley, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991). Therefore, I dissent from the reversal of the trial court's judgment in favor of Earle and its grant of the City's motion to dismiss with respect to Borders's claims alleging excessive use of force, false arrest, false imprisonment, and assault and battery.
BROWN, J., concurs.
STUART, Justice (concurring in part and dissenting in part).
I concur in affirming the trial court's denial of Borders's motion to recuse, the trial court's summary judgment in favor of Earle as to Borders's malicious-prosecution claim, and the summary judgment in favor of Earle and the order granting the City's motion to dismiss as to Borders's claim under 42 U.S.C. § 1983. I dissent from the reversal of the trial court's summary judgment in favor of Earle and its order granting the City's motion to dismiss with respect to Borders's claims alleging excessive use of force, false arrest, false imprisonment, and assault and battery. I believe that, based upon the evidence before it, the trial court's rulings as to all issues are due to be affirmed.
NOTES
[1] Moore was never served with a summons and complaint; the trial court dismissed the claims against him for failure to prosecute.
[2] Federal cases are authoritative in construing the Alabama Rules of Civil Procedure because the Alabama rules were patterned after the Federal Rules of Civil Procedure. Cutler v. Orkin Exterminating Co., 770 So.2d 67, 70 n. 2 (Ala.2000).
[3] In his reply brief, Borders included two appendices of material that was not made a part of the record. We grant the City and Earle's motion to strike the appendices from Borders's reply brief pursuant to Green v. Standard Fire Insurance Co. of Alabama, 398 So.2d 671, 673 (Ala.1981) (the record on appeal cannot be changed or altered by statements made in appellate briefs or evidence not appearing in the record).

In response to the City and Earle's motion to strike, Borders contends that the City should not be permitted to include the material submitted in Appendix A of its brief. However, based upon a review of the record, we find that the material submitted by the City was properly presented on pages 52-56 of the record.
[4] In Ex parte Cranman, 792 So.2d 392, 397 (Ala.2000), we referred to the immunity available to individual defendants sued for actions taken on behalf of the State as "State-agent immunity." State-agent immunity is withheld from State agents acting in their personal capacity, "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." 792 So.2d at 405. See also Ex parte Butts, 775 So.2d 173 (Ala.2000), in which a majority of this Court adopted the Cranman restatement of the rule governing State-agent immunity.
[5] The testimony of Childress is from the criminal proceeding.
[6] Keith's testimony is from the criminal proceeding.
[7] See Ex parte Coleman, 861 So.2d 1080 (Ala. 2003) (when considering a summary judgment motion, "[t]he court must accept the tendencies of the evidence most favorable to the nonmoving party and must resolve all reasonable doubts in favor of the nonmoving party").
[8] Justice See's special writing states that "[g]iven the testimony regarding the events leading to Borders's arrest, a reasonable police officer in Earle's position, charged with maintaining order at a dance club, could have believed that he had probable cause to arrest Borders." 875 So.2d at 1185. A jury may well share Justice See's view of the evidence and come to the same conclusion. However, in reviewing a summary judgment it is not appropriate for this Court to resolve the conflicting evidence as to what transpired at the dance club in a manner favorable to Earle.