[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 7, 2010
JOHN LEY
CLERK

_____

No. 09-12965

_____

D. C. Docket No. 07-01013-CV-5-VEH

JOI BROWN,
SHAUN SONIA,

Plaintiffs-Appellants,

versus

CITY OF HUNTSVILLE, ALABAMA,
GERALD L. NORRIS,
J. ANDERSON,
JIMMY ANDERSON,

Defendants-Appellees,

CHRIS HINES,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(June 7, 2010)

Before HULL, WILSON and FARRIS,[*] Circuit Judges.

HULL, Circuit Judge:

In this 42 U.S.C. § 1983 action, Plaintiffs-Appellants Joi Brown and Shaun Sonia bring federal and state claims for false arrest and excessive force. Plaintiffs appeal the district court's grant of summary judgment to the Defendants-Appellees – the City of Huntsville, Alabama (the "City"), and two police officers – on the basis of qualified immunity and state-law immunity. After review and oral argument, we affirm in part and reverse in part.

## I. FACTUAL BACKGROUND

At this juncture, we outline the Plaintiffs' version of the events.[1]

### A.    Brown's Arrest

On June 2, 2005, at around 8:30 p.m., Plaintiff Shaun Sonia arrived in his SUV at a Wal-Mart in Huntsville, Alabama. Several other passengers were in the SUV, including Travis Jones. Plaintiff Sonia parked near the entrance of the

---

[*]Honorable Jerome Farris, United States Circuit Judge for the Ninth Circuit, sitting by designation.

[1]We review a grant of summary judgment de novo, drawing all reasonable inferences in favor of the non-moving party. Anderson v. Cagle's, Inc., 488 F.3d 945, 951 (11th Cir. 2007). Summary judgment is appropriate when "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

Wal-Mart. Sonia and his passengers went into the Wal-Mart and remained inside the Wal-Mart for forty to fifty minutes.

Around 9:30 p.m., Plaintiff Brown arrived at the Wal-Mart to meet Travis Jones. Brown was driving a car actually owned by Jones. Brown admits she was playing "loud" music in the car as she arrived.[2] Brown stopped her car behind Plaintiff Sonia's SUV, rolled her driver's side window halfway down, and spoke to Sonia and Jones, who were standing next to Brown's car. Brown testified that she was playing the music loud enough for it to be heard outside the car, but not loud enough to prevent conversation from the driver's side window to individuals outside the vehicle.

_____

[2]Brown testified that her music was "loud" and that she rolled her window halfway down after she parked in the Wal-Mart parking lot:

> Q:        Not what your volume is, but what's the volume of
>           your music?
> [Brown]:  Yeah, that's what I'm saying, we're talking
>           to where, like, we understand what each other is
>           talking about, so I don't know, like, what the
>           volume would be to anyone else.
> Q:        To use your word, I believe you described it as your
>           music was loud in the car; would that be accurate?
> [Brown]:  Yes.
> Q:        Okay.
> [Brown]:  Yes.
> Q:        Your music was loud?
> [Brown]:  Yes.
> Q:        And your window is rolled down?
> [Brown]:  It's halfway down, just my window.
> Q:        The driver's side window?
> [Brown]:  Yes correct.

3

Around this time, members of the Madison-Morgan County Strategic Counterdrug Team (the "STAC Team"), including Defendants Sergeant Norris and Investigator Anderson, were conducting a drug bust resulting from an undercover drug buy in the Wal-Mart parking lot. The STAC Team was approximately 5-6 parking spots away from Brown's vehicle and could hear music coming from her car.

After speaking for a minute or two with Plaintiff Sonia and Travis Jones, Plaintiff Brown was told by a law enforcement officer to turn her music down. It is not clear which officer ordered Brown to turn down her music or how many times he made the request (witness accounts varied from one to three).[3] Brown turned the music off completely.[4] Defendant Norris approached Brown in her vehicle and informed her she could go to jail for playing music too loud. Brown replied, "I know that you can give me a ticket for this."

According to Plaintiff Brown, Norris then began yelling and acting

---

[3]Brown originally stated that she was told to turn her music down only once. Brown later stated that it was "possible," but not her recollection, that someone (she was not entirely sure who) could have told her to turn her music down more than once. ("Q: Do you think it's possible, though, that he could have told you before that, that may have been the second or third time he told you, is that possible? [Brown]: (Shaking Head). Q: Not possible? [Brown]: (Shaking Head). Q: No? [Brown]: I don't think so, but it could be possible, but I personally don't think, no. Q: If it was done, you didn't hear it? [Brown]: Correct.").

[4]Defendant Sergeant Norris stated that he could not recall if or when Brown turned the music in her car off or down.

"unprofessional[ly]" towards Brown.  Brown "panicked" and started an audio recording of Norris's actions with her mobile phone.  Brown informed Norris that she was recording him, stating, "[S]ir, I'm not recording your face, I'm recording the way you're talking to me, I'm a female, you don't have to talk to me like that."

Defendant Norris gave Plaintiff Brown clear instructions at least twice to step out of the vehicle, stating she was under arrest and should "get the fuck out the car."  Brown initially had some trouble unlocking her car's doors because in a panic she turned off the car's engine while the car's automatic transmission was in "drive" with the doors locked, and she was unable to unlock the door while the car was turned off and still in drive.  Brown testified:

> Q:      How many times did [Sergeant Norris] tell you to get out of the car?
>
> [Brown]:      He told me to get the F out the vehicle twice, to my knowledge, and he said it like that, get the fuck out, get the fuck out, you know, back to back.  And, I'm, like, you know, okay, and I tried, but the door – his – Travis' car, when you put it [in] drive, it automatically locks the doors, and once it's still in drive, you can't mash that button to unlock it.  It won't unlock.
>
> Q:      He tells you to get out of the car?
>
> [Brown]:      Uh-huh (Nodding head).
>
> Q:      Do you immediately get out?
>
> [Brown]:      I can't.

5

Q:     Do you immediately get out of the car?

[Brown]:     I can't.

At some point during the time in which Plaintiff Brown was attempting to get out of the car, Defendant Norris reached into the car window to retrieve Brown's mobile phone, including reaching between Brown's legs, where she had placed the phone.  At around the same time, Travis Jones tried to help Brown get out of his vehicle.  Norris told Jones that, "if he c[ame] any further, he w[ould] arrest him."  Plaintiff Brown asked Plaintiff Sonia to "use [his] phone and record" Defendant Norris's actions.

Brown also told Norris that, "if you'll let me out of the vehicle – if you'll let me turn the car on, put it in park, I will get out of the vehicle."  According to Brown, Norris then "paused for a minute."  Brown eventually turned on the car's electrical system, put the car in park, and opened the door.[5]  In her testimony, Brown maintains that she did not restart the car's engine, but merely turned the key to "on" to power up the car's electronics.

_____

[5]Defendant Norris stated that during the time in which Brown was still in the vehicle, it appeared to him that she was locking the car door as he tried to open it and was shifting the car into drive.  It also appeared to Defendant Norris that Brown was trying to drive off.  Norris could not recall, however, if the vehicle actually moved.  Defendant Anderson, who observed these events from a close distance, testified that he did not see anything to indicate that Brown was attempting to flee.  Anderson testified:  "Q. Did you see anything to you that indicated that Ms. Brown was attempting to flee? [Anderson].  No, sir, I can't say that I did."

6

Plaintiff Brown put her foot and arm outside the car door, trying to get out of the vehicle.[6] Defendant Norris then "slam[med] the door back" and yelled, "[S]he's trying to run, she's trying to run[.]" Brown screamed, "[N]o, I'm not, no, I'm not."

Defendant Norris then sprayed Plaintiff Brown with pepper spray in her mouth, eyes, and face. It is unclear how long Norris used pepper spray; accounts range from a half second to three seconds. Brown testified that Norris sprayed her with pepper spray as he was pushing her back in to the car and yelling that she was trying to run.[7] Norris threw Brown out of the vehicle while holding her arm and

---

[6]Brown testified:

> Q. [] Was there a point in time when [Norris] took out his pepper-spray and sprayed you?
> [Brown]. Yes, sir.
> Q. When did that happen? Where were you, and where was he?
> [Brown]. He was outside the vehicle, but it was after I had turned the car on, put it in park, and my foot was out the door and my arm was out the door. I was getting out of the vehicle, and that's when he started to scream, she's trying to run, and he shut the door on my leg, and I scooted it – you know, I moved it back, and he maced me at the same time.
> . . . .
> I was maced after the car was in park and after I opened the door. [Norris] shut the door back.

[7]Defendant Norris described a version of events generally at odds with Brown's version. Norris testified that he told Brown at least three times to turn her music down and, after the last time, told her that he would arrest her if she did not turn the music down. Norris could not recall if Brown ever lowered the volume of her music or turned it off completely. Norris originally decided to arrest Brown for violation of a noise ordinance. Upon being informed that she was under arrest, Brown stated, "No, I'm not under arrest," and said she would leave. Norris saw

7

hair and slammed her onto the ground. Defendant Anderson, who was nearby during Norris's exchange with Brown, assisted Norris in removing Brown from the car by grabbing one of Brown's arms, pulling her out of the car, and placing her face-down on the ground. Norris and Anderson handcuffed Brown's hands behind her back while she was on the ground.

Plaintiff Brown's phone was broken during this scuffle. Sonia and Brown both testified that Norris broke Brown's phone. Defendant Anderson testified that Brown held the phone in her hands under her body as she was placed face-down on the ground. Defendant Norris grabbed at the phone as he was trying to place handcuffs on Brown, and the phone snapped into two pieces. Sonia testified that he saw Norris take Brown's broken phone, put it in a bag with Sonia's phone, and place the bag on top of a car. According to Brown, an audio recording of her exchanges with Norris was saved to her cell phone. Brown was later told by someone in the police department that her phone was being held in evidence. The phone, including its recordings, was not returned to her.

Brown sustained burns to her face from the pepper spray and scrapes to her

_____

Brown lock her car doors, place the car into drive, and make preparations to drive away. Norris stated that Brown refused to get out of the car. Norris then told Plaintiff Brown that he would use pepper spray on her if she did not comply. Norris sprayed pepper spray at Brown's eyebrows. Norris also testified that he did not attempt to take Brown's mobile phone and did not know she was recording him.

knee and elbows. Brown did not seek medical treatment for her injuries.

Defendant Norris arrested Plaintiff Brown for disorderly conduct and resisting arrest and transported her to jail. Brown was found guilty in the District Court of Madison County, Alabama of resisting arrest but not guilty of disorderly conduct. Brown appealed her conviction to the Circuit Court of Madison County. On November 29, 2006, while on appeal, state prosecutors nolle prossed Brown's resisting arrest charge.

## B. Sonia's Arrest

Plaintiff Sonia also was arrested and claims his arrest violated his constitutional rights. Sonia walked out of Wal-Mart around 9:10 p.m. and noticed the STAC team conducting an undercover drug bust. Police Investigator Hudson, the agent in charge of the undercover drug buy, believed that the arrested drug suspects' supplier would be nearby. Sonia was standing near Brown's car when Defendant Norris told Brown to get out of the car.

Brown instructed Plaintiff Sonia to record what Defendant Norris was doing to her. Sonia complied by recording three 10-second video clips on his mobile phone. Investigator Hudson approached Sonia and requested the phone. Sonia told Hudson that he could not have his phone. Hudson then told Sonia he was under arrest and handcuffed him. Sonia asked why he was under arrest, and

9

Hudson replied that Sonia had yelled in the parking lot, which Sonia denies.[8]

Hudson took Sonia's phone during the arrest.

Sonia does not dispute that Investigator Hudson was the one who told Sonia he was under arrest and that Hudson handcuffed Sonia. Travis Jones testified that, prior to Sonia's arrest, he saw Norris point at Sonia and say, "Arrest him, too." Sonia heard Norris state that both Sonia and Brown were "going to jail[.]" Sonia also testified, however, that he did not have any information suggesting that Norris knew at the time of the arrest that Sonia was being arrested.

Defendants Norris and Anderson both deny involvement in the decision to arrest Plaintiff Sonia. Norris contends he was focused on arresting Brown and was unaware of what was said between Sonia and Investigator Hudson.[9] Defendant Anderson testified that he was unaware of what happened between Sonia and

---

[8]Sonia testified: "[Investigator Hudson] states to me, well, you yelled in Wal-Mart parking lot. I asked him are you serious, and then he basically grabbed my hands and turned me around and put a cuff on. And he couldn't get my other arm around so he got another cuff I believe and put it on." With the exception of Hudson, the other witnesses who saw this incident corroborate Sonia's assertion that he did not yell. Defendant Anderson stated he could not remember "Mr. Sonia yelling anything at Sgt. Norris . . . or at anybody else." Non-defendant Lieutenant Jimmy Winn indicated that "during the time [he] was looking at [Investigator Hudson and Sonia]," he never heard any yelling.

[9]Sergeant Norris testified that he "did not see Mr. Sonia once [he] started dealing with Ms. Brown," and while he "recall[ed] seeing Investigator Hudson, and . . . Mr. Sonia," he did not know where they were.

Investigator Hudson.[10]  Neither Defendants Norris nor Anderson were supervisors at the time of Sonia's arrest.  The record evidence does not reflect that Norris or Anderson had authority to direct the actions of Investigator Hudson, who made the arrest of Sonia.

Plaintiff Sonia claims Norris, Anderson, or Hudson deleted video evidence from his cell phone after it was taken during the arrest.  Neither Defendants Norris nor Anderson took Sonia's cell phone from him at the scene; however, Sonia claims he witnessed Defendant Norris eventually obtain possession of his cell phone.  When Investigator Hudson returned Sonia's cell phone to him the next day, two of the three video clips that Sonia had recorded of Brown's arrest were gone.  Sonia testified, "I don't know who deleted it but I know when I got the phone back I only had one video."  Investigator Hudson denies deleting, or even knowing of, any video clips.

Plaintiff Sonia was arrested and transported to jail.  Investigator Hudson was the only officer who physically arrested and handcuffed Sonia at the Walmart parking lot.  Once at the jail, however, Defendant Norris was the only officer

---

[10]Anderson swore in an affidavit that he "did not arrest Sonia, participate in Sonia's arrest, or have any involvement in the decision to arrest Sonia."  Anderson "did not observe Sonia's arrest," "was not even aware that Sonia was being arrested because at the time of his arrest [he] was assisting Sergeant Gerry Norris with the arrest of plaintiff Joi Brown," and was "not the officer who developed probable cause to arrest Sonia."

present during Sonia's booking, and he completed the paperwork. Norris "initially [] wrote harassment" as the charge against Sonia but changed the charge to "disorderly conduct." Both Investigator Hudson and Norris are listed as arresting officers on the Alabama Uniform Arrest Report (the "Report") relating to Sonia's arrest. Investigator Hudson signed the criminal complaint against Sonia and was listed as the complainant on the warrant for Sonia's arrest.

The disorderly conduct charge against Sonia was nolle prossed two months after Sonia's arrest.

## C.    District Court Proceedings

On May 31, 2007, Plaintiffs Brown and Sonia filed this § 1983 action against Defendants Norris and Anderson, individually, and against the City. Plaintiffs did not sue Investigator Hudson.[11]

Plaintiffs' current amended complaint alleges four counts: (1) Brown's and Sonia's § 1983 claims for false arrest against Norris and Anderson;[12] (2) Brown's and Sonia's state-law claims for false arrest/false imprisonment against Norris, Anderson, and the City; (3) Brown's § 1983 claims for excessive force against

---

[11]Plaintiffs initially sued City police officer Chris Hines, alleging he was the officer who arrested Sonia. Hines later was dismissed, and Plaintiffs do not appeal that dismissal.

[12]Title 42, section 1983 provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law. Von Stein v. Brescher, 904 F.2d 572, 578 (11th Cir. 1990).

12

Norris and Anderson; and (4) Brown's state-law claim for assault and battery/excessive force against Norris, Anderson, and the City.[13]

Defendants moved for summary judgment on the basis of qualified immunity for Plaintiffs' § 1983 claims and state-law immunity for Plaintiffs' state-law claims. On May 14, 2009, the district court granted the Defendants' summary judgment motions. Brown v. City of Huntsville, No. 07-1013, slip. op. (N.D. Ala. May 14, 2009). Plaintiffs timely appealed.

## II. DISCUSSION

We first outline the qualified immunity defense to § 1983 claims, then address each Plaintiff's § 1983 claims, and close by considering the Defendants' immunity from the state-law claims.

## A. Qualified Immunity

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). A law

---

[13]Plaintiffs Brown and Sonia conceded to the district court that summary judgment was appropriate to the City on their § 1983 claims for false arrest and excessive force. Plaintiffs did not appeal the district court's grant of summary judgment to the City on their § 1983 claims, so that issue is not before us now. The only remaining claims against the City are state-law claims.

enforcement officer is entitled to qualified immunity if "an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Id. Qualified immunity from suit is intended to "allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit all but the plainly incompetent or one who is knowingly violating the federal law." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002) (internal quotation marks and citations omitted).

Courts utilize a two-part framework to evaluate qualified immunity claims.[14] One inquiry in a qualified immunity analysis is whether the plaintiff's allegations, if true, establish a constitutional violation. Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513 (2002) (citing Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156 (2001)). If the facts, construed as they must be in this summary judgment appeal in the light most favorable to the plaintiff, show that a constitutional right has been violated, another inquiry is whether the right violated was "clearly established." Saucier, 533 U.S. at 201, 121 S. Ct. at 2156. Both elements of this test must be present for an official to lose qualified immunity, and

---

[14]Prior to applying the two-part test, the initial inquiry in a qualified immunity case is whether the public official proves "that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." Lee, 284 F.3d at 1194 (internal quotation marks omitted). The parties in this case do not contest that Norris and Anderson were acting within the scope of their discretionary authority as law enforcement officers at the time of Brown's and Sonia's arrests, so we proceed to consider whether qualified immunity is available as a defense.

14

this two-pronged analysis may be done in whatever order is deemed most appropriate for the case. <u>Pearson v. Callahan</u>, 555 U.S. ___, 129 S. Ct. 808, 821 (2009).

**B.    Brown's § 1983 False Arrest Claims**

Plaintiff Brown argues Norris's arrest of her was not supported with arguable probable cause. The district court disagreed and granted qualified immunity to Norris for Brown's arrest. We affirm.

An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a § 1983 claim, but the existence of probable cause at the time of arrest is an absolute bar to a subsequent constitutional challenge to the arrest.[15] <u>Case v. Eslinger</u>, 555 F.3d 1317, 1326-27 (11th Cir. 2009); <u>Kingsland v. City of Miami</u>, 382 F.3d 1220, 1226, 1232 (11th Cir. 2004); <u>Ortega v. Christian</u>, 85 F.3d 1521, 1525 (11th Cir. 1996). Probable cause exists where the facts within the collective knowledge of law enforcement officials, derived from reasonably trustworthy information, are sufficient to cause a person of reasonable caution to believe that a criminal offense has been or is being committed. <u>Madiwale v.</u>

---

[15]The Fourth Amendment, which is applicable to the States through the Fourteenth Amendment, guarantees the right against unreasonable searches and seizures. <u>Von Stein</u>, 904 F.2d at 578; U.S. Const. amend. IV. An arrest without probable cause violates the Fourth Amendment. <u>Madiwale v. Savaiko</u>, 117 F.3d 1321, 1324 (11th Cir. 1997). This cause of action may be asserted through § 1983 as a claim for damages. <u>Von Stein</u>, 904 F.2d at 578.

Savaiko, 117 F.3d 1321, 1324 (11th Cir. 1997).

To receive qualified immunity, an officer need not have actual probable cause, but only "arguable" probable cause. Holmes v. Kucynda, 321 F.3d 1069, 1079 (11th Cir. 2003); Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). Arguable probable cause exists where "reasonable officers in the same circumstances and possessing the same knowledge as the Defendants could have believed that probable cause existed to arrest Plaintiff." Kingsland, 382 F.3d at 1232 (quotation marks omitted); accord Redd v. City of Enterprise, 140 F.3d 1378, 1382 (11th Cir. 1998); Gold v. City of Miami, 121 F.3d 1442, 1445-46 (11th Cir. 1997) (disorderly conduct under Florida law); Von Stein v. Brescher, 904 F.2d 572, 579 (11th Cir. 1990). "Indeed, it is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and in such cases those officials should not be held personally liable." Von Stein, 904 F.2d at 579 (quotation marks and ellipses omitted); see also Hunter v. Bryant, 502 U.S. 224, 227, 112 S. Ct. 534, 536 (1991) ("Even law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity." (quotation marks omitted)); Montoute, 114 F.3d at 184 ("Thus, the qualified immunity standard is broad enough to cover some 'mistaken judgment []' . . . ."). The standard is an objective one and does not include an

16

inquiry in to the officer's subjective intent or beliefs. Rushing v. Parker, 599 F.3d

1263, 1266 (11th Cir. 2010).

Whether an officer possesses probable cause or arguable probable cause

depends on the elements of the alleged crime and the operative fact pattern. Skop

v. City of Atlanta, 485 F.3d 1130, 1137-38 (11th Cir. 2007); Crosby v. Monroe

County, 394 F.3d 1328, 1333 (11th Cir. 2004). Showing arguable probable cause

does not, however, require proving every element of a crime. Scarbrough v.

Myles, 245 F.3d 1299, 1302-03 (11th Cir. 2001). If the arresting officer had

arguable probable cause to arrest for any offense, qualified immunity will apply.

Skop, 485 F.3d at 1138. Accordingly, we consider whether Defendant Sergeant

Norris had arguable probable cause to arrest Plaintiff Brown for disorderly

conduct.[16]

Alabama law defines disorderly conduct as:

> (a) A person commits the crime of disorderly conduct if,
> with intent to cause public inconvenience, annoyance or
> alarm, or recklessly creating a risk thereof, he:
> . . .
>> (2) Makes unreasonable noise . . . .

---

[16]We consider only the disorderly conduct charge because Sergeant Norris is entitled to qualified immunity if he had arguable probable cause to arrest either for disorderly conduct or for resisting arrest. We also note that the resisting arrest charge against Plaintiff Brown arose from her conduct during the arrest for disorderly conduct, so the resisting arrest charge depends in part on the validity of Plaintiff Brown's arrest for disorderly conduct.

17

Ala. Code § 13A-11-7 (1975).  Disorderly conduct is a Class C misdemeanor.[17]  Id. § 13A-11-7(b).  Where the disorderly conduct charge is premised upon subsection (a)(2)'s "unreasonable noise" proscription, we must consider whether the noise made was unreasonable under the circumstances.  Swann v. City of Huntsville, 455 So.2d 944, 950 (Ala. Crim. App. 1984); see also Ala. Code § 13A-11-7 cmt. ¶ 9 ("Unreasonable was chosen rather than loud as loud noises are sometimes appropriate.").[18]  The requisite intent may be inferred from the conduct of the defendant.  See Ala. Code § 13A-11-7 cmt. ¶ 3.

Defendant Norris had at least arguable probable cause to arrest Brown for disorderly conduct.  The facts, even when viewed in the light most favorable to Brown, are that Brown arrived in the Wal-Mart parking lot in a vehicle playing

---

[17]At oral argument, Defendants' counsel confirmed that a disorderly conduct charge requires a physical arrest – i.e., Sergeant Norris could not merely have issued Plaintiff Brown a citation or ticket for disorderly conduct.

[18]The intent element in § 13A-11-7(a)(2) saves the prohibition on "unreasonable noise" from being an unconstitutional restriction on First Amendment free-speech rights.  Sterling v. State, 701 So.2d 71, 74 (Ala. Crim. App. 1997).  Plaintiffs do not challenge the validity of § 13A-11-7(a)(2) on constitutional grounds.  Rather, they claim the district court erred because, "Brown's conduct during Norris' arresting of her was part of her legitimate resistance to the unlawful arrest, was protected First Amended [sic] speech, cannot supply probable cause for the prior decision to arrest, and was an attempt to communicate with the screaming Norris that is not a violation of the disorderly conduct statute."  Contrary to Plaintiffs' claims, the district court based its arguable probable cause conclusion on the loud noise from Brown's music, which is not even arguably protected First Amendment speech.  See Brown v. City of Huntsville, No. 07-1013, slip. op. at 27 (N.D. Ala. May 14, 2009) ("Here, at a minimum, Defendants Norris and Anderson had arguable probable cause to arrest Brown for disorderly conduct as Brown admits that she was playing music that was loud and that the driver's side window was rolled down half-way . . . [and] there is no dispute that Defendants Norris and Anderson personally heard the music that Brown was playing . . . .").

admittedly "loud" music, stopped her car in the parking lot, rolled down the driver's side window to some extent, and spoke out of the window to Jones while the music still was playing. Brown's music was loud enough that Sergeant Norris and Investigator Anderson, who were at the time several parking spots away from her vehicle, heard the music. Lieutenant Winn, Investigator Hudson, and Investigator Leftwich also heard loud music. The playing of loud music is a willful act. Sergeant Norris testified that he had to tell Brown three times to turn her music down. Brown admits she was told once and that her music was loud and that it was possible she was told a second or third time, but she did not hear it. Brown at least once had to ask Travis Jones to repeat what was said to her by a law enforcement officer outside her car, providing some context for how loud her music must have been.

In short, we look only to whether a reasonable officer, knowing what Sergeant Norris knew at the time, objectively could have believed probable cause existed. We conclude Brown's actions in playing loud music, stopping her car, and rolling her window down could have indicated to an objectively reasonable officer at the scene that Brown was making unreasonable noise with intent to create public annoyance, even if those circumstances were insufficient to prove an actual violation of § 13A-11-7. See, e.g., Hutchins v. City of Alexander City, 822 So.2d

19

459, 462 (Ala. Crim. App. 2000) (finding prima facie case of disorderly conduct where defendant made unreasonable noise in public area of police station). The district court consequently did not err in determining Sergeant Norris was entitled to qualified immunity on Plaintiff Brown's § 1983 claim for false arrest.

Plaintiff Brown's false arrest claim against Defendant Anderson also fails. Norris, not Anderson, made the decision to arrest Brown. Brown does not identify any conduct of Defendant Anderson that would support a false arrest claim against him. In any event, there was arguable probable cause for Brown's arrest. While Anderson also assisted Norris in removing Brown from the vehicle, we consider that conduct in our discussion of Brown's excessive force claim. Qualified immunity applies to Defendant Anderson for Brown's false arrest claim.

## C.    Sonia's § 1983 False Arrest Claims

It is undisputed that Investigator Hudson, whom Sonia did not sue, was the officer who witnessed Sonia's behavior and actually arrested and handcuffed Sonia and signed the criminal complaint against Sonia. The district court did not err in granting qualified immunity to Defendants Norris and Anderson because they did not participate in Sonia's arrest and were not Hudson's supervisors.[19]

---

[19]The district court pointed out that Plaintiffs' complaint does not allege conduct against Anderson suggesting any involvement in Sonia's arrest. There is a question as to whether Sonia even has alleged a § 1983 false arrest claim against Anderson, but the parties have briefed the case as if Sonia does allege a § 1983 false arrest claim against Anderson, so we consider that

To establish § 1983 liability, a plaintiff must show "proof of an affirmative causal connection" between a government actor's acts or omissions and the alleged constitutional violation, which "may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation." Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986).  Merely being present with the arresting officers at the scene is not enough, unless the plaintiff can show that the defendant officer was part of the chain of command authorizing the arrest action.

Here, the facts do not show personal participation by Defendants Norris or Anderson in Sonia's arrest.  Viewed in the light most-favorable to Plaintiff Sonia, while Defendant Norris was arresting Plaintiff Brown, he said "arrest [Sonia], too."[20]  However, Norris was not Hudson's supervisor or even in Hudson's chain of command.  Hudson had his own authority to arrest and actually utilized it at the scene.  While Hudson was arresting Sonia, Norris was busy arresting Brown and testified that he was not aware Hudson was arresting Sonia.  There was no active personal participation by Norris in Sonia's arrest, much less an opportunity to

claim here.  We determine that the evidence does not establish a constitutional violation by Anderson as to Sonia's arrest.  Further, in analyzing whether Defendants Norris and Anderson can be liable for Sonia's false arrest claim, we assume for the purposes of this opinion that non-party Investigator Hudson violated Sonia's Fourth Amendment rights by arresting him without arguable probable cause.

[20]Norris denies he said this, but Travis Jones testified that he heard Norris say it.

21

intervene in Hudson's arrest at the scene. At most, Plaintiffs have shown that Norris arguably <u>wanted</u> Hudson to arrest Sonia. But an officer's subjective intent is irrelevant in a qualified immunity analysis. Because Norris did not arrest Sonia and had no supervisory control over the officer who did, qualified immunity is appropriate.

Accordingly, the district court did not err in granting qualified immunity to Defendants Norris and Anderson on Sonia's § 1983 claims for false arrest.

## D.    Brown's § 1983 Excessive Force Claim

Plaintiff Brown claims Defendants Norris and Anderson used excessive force during her arrest.

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." <u>Lee</u>, 284 F.3d at 1197 (citing <u>Graham v. Connor</u>, 490 U.S. 386, 394-95, 109 S. Ct. 1865, 1871 (1989)). "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" <u>Lee</u>, 284 F.3d at 1197 (quoting <u>Graham</u>, 490 U.S. at 396, 109 S. Ct. at 1871-72). But while some force is permitted in effecting an arrest, whether the force is reasonable depends on "a careful balancing of the

nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Vinyard, 311 F.3d at 1347 (quotation marks omitted).[21]

A law enforcement officer receives qualified immunity for use of force during an arrest if an objectively reasonable officer in the same situation could have believed the use of force was not excessive. Id.; Graham, 490 U.S. at 396-97, 109 S. Ct. at 1872; Lee, 284 F.3d at 1197. "Use of force must be judged on a case-by-case basis 'from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (quoting Graham, 490 U.S. at 396, 109 S. Ct. at 1872), modified, 14 F.3d 583 (11th Cir. 1994). We judge use of force solely on an objective basis, and we do not consider an officer's subjective belief. Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008).

"To balance the necessity of the use of force . . . against the arrestee's constitutional rights, a court must evaluate several factors, including '[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to

---

[21]However, "even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect." Reese v. Herbert, 527 F.3d 1253, 1272 (11th Cir. 2008) (quotation marks omitted). We already concluded above that arguable probable cause existed to arrest Brown, so our question now is whether Norris and Anderson used too much force in effecting that arrest.

23

the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight.'" Vinyard, 311 F.3d at 1347 (quoting Graham, 490 U.S. at 396, 109 S. Ct. at 1872). "Our cases hold that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." Hadley, 526 F.3d at 1330.

On several occasions, this Court has evaluated the use of pepper spray during an arrest. In Vinyard v. Wilson, we reversed a grant of qualified immunity to an officer who used pepper spray on an arrestee. The plaintiff was under arrest for disorderly conduct and detained in the back of a police car, with her hands cuffed behind her back and with a glass or plastic partition separating the officer from the arrestee. Vinyard, 311 F.3d at 1349, 1355. To stop the arrestee from returning the officer's exchanges of obscenities and insults during a four-mile ride to the jail, the officer stopped his car, grabbed the arrestee's arm and hair, and sprayed her in the face with two or three bursts of pepper spray. Id. at 1343. This Court held that this use of force clearly exceeded the Fourth Amendment's excessiveness threshold. Id. at 1348, 1355 ("Courts have consistently concluded that using pepper spray is excessive force in cases where the crime is a minor infraction, the arrestee surrenders, is secured, and is not acting violently, and there is no threat to the officers or anyone else."). We based our holding on all Graham

factors weighing in favor of the plaintiff arrestee: (1) her crime of disorderly conduct was minor; (2) under her version of the facts, she was secured and was not posing a safety threat to the officer, herself, or others; and (3) she did not resist arrest or attempt to flee. Id. at 1347-48.

We later applied Vinyard's holdings in Reese v. Herbert, 527 F.3d 1253, 1273-74 (11th Cir. 2008), denying qualified immunity to officers who used pepper spray in the face of an arrestee who "was lying face down on the ground, was not suspected of having committed a serious crime, did not pose an immediate threat of harm to anyone, and was not actively resisting or evading arrest . . . ." Id.

In contrast, this Court has noted that the use of pepper spray is not excessive force in situations where the arrestee poses a threat to law enforcement officers or others, uses force against officers, physically resists arrest, or attempts to flee, in which cases pepper spray is a permissible way to "disable a suspect without causing permanent physical injury." Vinyard, 311 F.3d at 1348 (quotation marks omitted). "Indeed, pepper spray is a very reasonable alternative to escalating a physical struggle with an arrestee." Id. For example, in Garrett v. Athens-Clarke County, 378 F.3d 1274, 1280-81 (11th Cir. 2004), we held that use of pepper spray was not excessive force where the arrestee led police on a high-speed vehicle chase, physically resisted arrest, attempted to flee, attempted to harm law

enforcement officers, and attempted to take an officer's pistol. Id. at 1276-77. In

McCormick v. City of Fort Lauderdale, 333 F.3d 1234 (11th Cir. 2003), we

determined that the use of pepper spray on a suspected violent felon was a

reasonable response to the scene confronting the officer – a victim on the floor

with a bleeding head wound and her likely assailant standing near her and armed

with a walking stick. Id. at 1244-45.[22] "Given that pepper spray ordinarily causes

only temporary discomfort, it may be reasonably employed against potentially

violent suspects, especially those suspects who have already assaulted another

person and remain armed." Id. at 1245.

Given the facts in the light most favorable to Brown, the district court

improperly granted summary judgment to Defendant Norris on Brown's excessive

force claim. Under Brown's version, Norris's actions in effecting the arrest

constitute excessive force. Each Graham factor supports Brown. First, Brown was

not arrested for a serious crime. Second, Brown did not pose a threat to anyone's

safety. Third, under Brown's account of the facts, she was cooperative, was not

resisting arrest, and was not attempting to flee. She complied with Defendant

Norris's requests and attempted to get out of the vehicle but was delayed by the

---

[22]This Court also concluded that there is no constitutional requirement that a law enforcement officer first give the suspected violent felon a verbal warning and opportunity to submit before using pepper spray. McCormick, 333 F.3d at 1245.

26

door locks, which she clearly communicated to Norris. Brown then had actually opened the door and was getting out when Norris pushed her back in the car and sprayed her. Norris's subjective beliefs are not relevant. What we consider instead is what an objectively reasonable officer in Norris's situation would have believed, taking as true Brown's testimony. Given that Brown had submitted to Norris's authority, was getting out of the car to be arrested, and posed no threat, Norris's conduct in pushing her back into the car, gratuitously using pepper spray, and then slamming her to the pavement, was excessive force that violated Brown's constitutional rights.[23]

Furthermore, an objectively reasonable police officer would have known it was unlawful to use pepper spray and other force against an arrestee who was suspected only of a minor offense (playing music too loud), was not threatening the officer or the public, was not attempting to flee, and who had communicated her willingness to be arrested. Although the law permits some use of force in any arrest for even minor offenses, the law was clearly established in 2005 that Defendant Norris's combined gratuitous use of pepper spray and other force against Brown in this minor offense context violated the Constitution. See, e.g.,

---

[23]Although we primarily discuss Norris's use of pepper spray, we reiterate that Brown's excessive force claim concerns the entirety of the force used by Norris in effecting the arrest, including the force used to throw her out of the car face-down, slam her on the pavement, and handcuff her.

Vinyard, 311 F.3d at 1347-49; Lee, 284 F.3d at 1198-1200.[24]

The district court accordingly erred in granting qualified immunity to Defendant Norris on Brown's excessive force claim.

As to Defendant Anderson, however, there is some question over whether Plaintiff Brown even sued Anderson for excessive force. We need not resolve that issue. There is no evidence that Anderson used any pepper spray. Anderson at most assisted Norris in pulling Brown out of the car, which in this case is a permissible use of force in effecting an arrest. A law enforcement officer's right to arrest necessarily carries with it the ability to use some force in making the arrest. Lee, 284 F.3d at 1197-98. For even minor offenses, permissible force includes physical restraint, use of handcuffs, and pushing into walls. See Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000) ("[T]his Circuit has established the principle that the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment."); Lee, 284 F.3d at 1200 (citing cases permitting use of handcuffs); Jones v. City of Dothan, 121 F.3d 1456, 1460 (11th Cir. 1997) (no constitutional violation to slam plaintiff against wall, kick plaintiff's legs apart, and require plaintiff to raise arms above his head); Gold,

---

[24]The Court applied Vinyard's holding in Reese v. Herbert, 527 F.3d at 1273-74, concluding it was excessive force to use pepper spray on a non-threatening arrestee who was face-down on the ground and suspected of only a minor offense. Being a 2008 case, however, Reese cannot be used to establish the constitutional bounds of Defendant Norris's 2005 conduct.

28

121 F.3d 1442 at 1446-47 (no constitutional violation for arresting plaintiff for disorderly conduct and affixing handcuffs too tightly); Post, 7 F.3d at 1559-60 (not excessive force to arrest plaintiff for building code violation by pushing him up against wall and applying chokehold to unresisting plaintiff while affixing handcuffs). Because Anderson was permitted to use some force in arresting Brown, Brown has not shown Anderson's conduct in forcibly removing Brown from the car violated her constitutional rights.[25]

E.      **Plaintiffs' State-Law Claims**

Plaintiffs Brown and Sonia argue the district court erred in granting the Defendants immunity from Plaintiffs' state-law claims. Brown and Sonia asserted state-law claims for false arrest/false imprisonment against Defendants Norris, Anderson, and the City. Brown also asserted a claim for assault and battery/excessive force against these Defendants.

Under Alabama law, "[s]tate-agent immunity protects state employees, as agents of the State, in the exercise of their judgment in executing their work responsibilities." Ex parte Hayles, 852 So.2d 117, 122 (Ala. 2002). In Ex parte

---

[25]A non-arresting officer may be liable for another officer's use of excessive force, but only if "the non-intervening officer was in a position to intervene yet failed to do so." Hadley, 526 F.3d at 1330-31. Because the relevant events happened so quickly, the record does not reflect any point at which Anderson could have intervened to prevent Norris's use of excessive force, especially pepper spray, on Brown. Anderson accordingly is not liable for failure to intervene in Norris's use of force.

29

Cranman, 792 So.2d 392 (Ala. 2000), a plurality of the Alabama Supreme Court restated and clarified the scope of Alabama's state-agent immunity doctrine, which bars suit against law enforcement officers effecting arrests, except to the extent the officer acted willfully, maliciously, fraudulently, in bad faith, beyond his legal authority, or under a mistaken interpretation of law, or if the Constitution or laws of the United States or Alabama require otherwise. Id. at 405.[26]

There is also statutory, discretionary-function immunity in Alabama. Specifically, § 6-5-338 of the Alabama Code contains a provision immunizing law enforcement officers from tort liability for conduct within the scope of their discretionary law enforcement duties. Ala. Code § 6-5-338(a) (1994) ("Every peace officer . . . shall have immunity from tort liability arising out of his or her conduct in performance of any discretionary function within the line and scope of his or her law enforcement duties."). Cranman's test for state-agent immunity governs whether law enforcement officers are entitled to statutory, discretionary-function immunity under § 6-5-338(a). Ex parte City of Tuskegee, 932 So.2d 895, 904 (Ala. 2005) ("The restatement of State-agent immunity as set out in Cranman, 792 So.2d at 405, now governs the determination of whether a peace officer is entitled to immunity under § 6-5-338(a)."). So for our purposes, the question of

_____

[26]The Alabama Supreme Court formally adopted the Cranman plurality's state-agent immunity test in Ex parte Butts, 775 So.2d 173, 177-78 (Ala. 2000).

whether City police officers Defendants Norris and Anderson receive immunity for Plaintiffs' state-law claims depends on application of Cranman's state-agent immunity test.

The Alabama Supreme Court established a burden-shifting framework for application of the state-agent immunity test. A defendant initially bears the burden of demonstrating that he was acting in a function that would entitle the agent to immunity. Ex parte Estate of Reynolds, 946 So.2d 450, 452 (Ala. 2006). "If the State agent makes such a showing, the burden then shifts to the plaintiff to show that the State agent acted willfully, maliciously, fraudulently, in bad faith, or beyond his or her authority." Id.

Turning to the claims against Defendants Norris and Anderson, there is no dispute that both Norris and Anderson were acting within the scope of their discretionary functions as law enforcement officers; Plaintiffs admitted as much in their brief opposing summary judgment. ("Making an arrest is a discretionary function."). Plaintiffs thus bear the burden of showing that Defendants Norris and Anderson acted willfully, maliciously, fraudulently, in bad faith, beyond their legal authority, or under a mistaken interpretation of the law.

As to Plaintiff Brown's false arrest/false imprisonment claim, we conclude Brown has not met this burden. The Alabama Supreme Court has applied the

31

same "arguable probable cause" standard utilized in this Court's federal qualified immunity cases for determining whether a city police officer receives state-agent immunity for his role in an arrest. Borders v. City of Huntsville, 875 So.2d 1168, 1180 (Ala. 2003) ("If . . . a jury question exists as to whether [the officer] acted with arguable probable cause, [then] the summary judgment [to the officer] must be reversed."). As held above, Defendants Norris and Anderson receive qualified immunity for their conduct in arresting Brown because the facts, construed in the light most favorable to Brown, show that they had arguable probable cause to arrest Brown. Defendants Norris and Anderson receive both state-agent and statutory, discretionary-function immunity under § 6-5-338(a) from Brown's false arrest claim for the same reasons.

Plaintiff Brown's assault and battery/excessive force claim against Defendants Norris and Anderson presents a closer question, but, similar to our reasoning for denying Defendant Norris qualified immunity for his use of pepper spray and other force against Brown, Defendant Norris also does not receive state-agent or statutory, discretionary-function immunity for that conduct. Construing the facts in the light most favorable to Plaintiff Brown, Defendant Norris's use of pepper spray and other force against Plaintiff Brown was done intentionally, gratuitously, and in violation of Plaintiff Brown's clearly established constitutional

32

rights, supporting an inference that Norris acted willfully and in bad faith. In contrast, Defendant Anderson's use of force against Plaintiff Brown does not constitute a constitutional violation, and neither does it show the required willfulness, maliciousness, fraud, or bad faith necessary to deny Anderson state-agent and statutory, discretionary-function immunity.

As to Plaintiff Sonia's false arrest/false imprisonment claim, Sonia has not carried his burden to show facts supporting willful, malicious, or bad faith actions by Defendants Norris and Anderson. Hudson, not Norris or Anderson, actually arrested and handcuffed Sonia. At most, Norris allegedly said "arrest" Sonia, but given that Norris had no authority over Hudson, that alone is insufficient to strip away Norris's state-agent and statutory, discretionary-function immunity.

Finally, the district court correctly granted summary judgment to the City from both Plaintiffs' state-law false arrest/false imprisonment claims and Brown's state-law assault and battery/excessive force claim. "[U]nder principles of vicarious liability, where a municipal employee enjoys immunity, the municipality likewise is immune as to claims based on the employee's conduct." City of Bayou La Batre v. Robinson, 785 So.2d 1128, 1131 (Ala. 2000). In cases such as this where the "municipal employee" is a law enforcement officer, Alabama's statutory, discretionary-function immunity explicitly extends an officer's immunity

33

to the employing municipality. Ala. Code § 6-5-338(b) ("This section is intended to extend immunity only to peace officers and governmental units or agencies authorized to appoint peace officers.") (emphasis added); Ex parte City of Gadsden, 781 So.2d 936, 940 (Ala. 2000) (concluding § 6-5-338(a) gave officer discretionary-function immunity and "[t]he plain language of § 6-5-338(b) . . . extends that discretionary-function immunity to the City"); Borders, 875 So.2d at 1183. Because we find that Norris and Anderson are entitled to statutory, discretionary-function immunity for Brown's and Sonia's false arrest/false imprisonment claims, § 6-5-338(b) extends that immunity to the City as well.

As to Brown's assault and battery/excessive force claim, however, Norris is not entitled to statutory, discretionary-function immunity, and thus § 6-5-338(b) cannot immunize the City. The City instead relies on another statute providing that Alabama cities are not vicariously liable for the torts of their agents, unless the agent acted with "neglect, carelessness, or unskillfulness." Ala. Code § 11-47-190 ("No city or town shall be liable for damages for injury done to or wrong suffered by any person or corporation, unless such injury or wrong was done or suffered through the neglect, carelessness, or unskillfulness of some agent, officer, or employee of the municipality . . . ."); see Hardin v. Hayes, 52 F.3d 934, 939 n.9 (11th Cir. 1995) ("§ 11-47-190 imposes respondeat superior liability on

34

municipalities for employee negligence"). "Section 11-47-190 provides for an action against a municipality for the 'neglect, carelessness or unskillfulness' of its agents, not for their intentional torts." Franklin v. City of Huntsville, 670 So.2d 848, 850 (Ala. 1995); see Ex parte City of Gadsden, 718 So.2d 716, 721 (Ala. 1998) ("Section 11-47-190 . . . absolves a city from liability for an intentional tort committed by one of its agents . . . ."). In sum, under § 11-47-190, a city is liable for negligent acts of its employees within the scope of their employment, but not intentional torts of its employees.

Complicating matters is Borders, 875 So.2d at 1183, where the Alabama Supreme Court held that where it was unclear whether the plaintiff's claims for "assault and battery, false imprisonment and false arrest," actually asserted "vicarious liability for an intentional tort against the City," § 11-47-190 would not immunize the City "where a plaintiff alleges a factual pattern that demonstrates neglect, carelessness, or unskillfulness." Id. (quotation marks omitted). In this case, however, all of Brown's evidence indicated that Norris's use of pepper spray and other force against her was intentional, as opposed to neglectful or careless. The factual issues in this case are not over whether Norris's acts were intentional, but over what Brown did or did not do before Norris acted, the extent of force Norris used, and whether Brown's actions justified Norris's use of force in

35

response.[27]  The district court accordingly did not err in granting immunity to the City on Brown's state-law assault and battery/excessive force claim against Norris.

### III. CONCLUSION

In sum, we affirm in part and reverse in part the district court's order, dated May 14, 2009, granting qualified and state-law immunities to Defendants Norris and Anderson and the City.  We conclude: (1) Defendants Norris and Anderson are entitled to qualified immunity from Plaintiffs Brown's and Sonia's federal false arrest claims and state-agent and statutory, discretionary-function immunity from Brown's and Sonia's state-law false arrest/false imprisonment claims; and (2) Defendant Anderson is entitled to qualified immunity from Brown's § 1983 excessive force claim and to state-agent and statutory, discretionary-function immunity from Brown's state-law claim for assault and battery/excessive force. We reverse the district court's summary judgment order granting to Norris (1) qualified immunity from Brown's § 1983 excessive force claim and (2) state-agent and statutory, discretionary-function immunity from her state-law assault and battery/excessive force claim.  Finally, we affirm the district court's grant of

----

[27]While the Plaintiffs' Amended Complaint alleges the conduct of Norris and Anderson was "either negligent, wanton, malicious, willful, or in bad faith," Am. Compl. ¶¶ 27, 38, at the summary judgment stage the evidence showed Norris acted intentionally.  No evidence showed either Norris or Anderson acted negligently or carelessly.  In Borders, the plaintiff disavowed any claim of an intentional tort and instead contended "that his allegations are all based upon the 'neglect, carelessness, or unskillfulness' of [the defendant]."  Borders, 875 So.2d at 1183.

immunity to the City from Plaintiffs' state-law false arrest/false imprisonment and assault and battery/excessive force claims.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**