[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-13662
Non-Argument Calendar
_____

D.C. Docket No. 2:10-cv-00097-RWS


GARY VALENTINE,

Plaintiff,

LAURA VALENTINE,

Plaintiff-Appellant,

versus

SHERIFF JOEL ROBINSON,
in his individual and official capacities,
DEPUTY ANDRA BUSH,
in her individual and official capacities,
INVESTIGATOR FAYE SPAULDING,
in her individual and official capacities,
and INVESTIGATOR LISA CARR,
in her individual and official capacities,

Defendants-Appellees,

DEPUTY IAN GEIMAN,
in his individual and official capacities,

Defendant.

_____

Appeal from the United States District Court
for the Northern District of Georgia
_____

(January 30, 2015)

Before JORDAN, BLACK, and EDMONDSON, Circuit Judges.

PER CURIAM:

Plaintiff Laura Valentine appeals the district court's grant of summary judgment in favor of Defendants Deputy Andra Bush, Investigator Faye Spaulding, and Investigator Lisa Farlow[1] in Plaintiff's civil action under 42 U.S.C. § 1983. Plaintiff filed suit against Defendants, in their individual capacities, asserting federal claims for false arrest and for conspiracy.[2]  The district court granted

_____

[1] At the time of these events, Lisa Farlow was known as Lisa Carr.

[2] The amended complaint also included claims on behalf of Plaintiff's husband, a claim for unlawful detention and confinement, and claims against Sheriff Joel Robinson, Deputy Sheriff

2

Defendants' motion for summary judgment, concluding that Defendants were entitled to qualified immunity. No reversible error has been shown; we affirm.

This case arises out of a custody dispute over Plaintiff's then-five-year-old granddaughter, Iris. Iris's parents, William (Plaintiff's son) and Chrisalena, had separated and filed for divorce. At the time of these events, in May 2008, Iris and William were living with Plaintiff in Georgia; and Chrisalena was living in Texas.

On 26 May, Chrisalena and her lawyer showed Deputy Bush an order from a Texas court which purportedly granted Chrisalena custody of Iris.[3] Chrisalena's lawyer also told Deputy Bush that there had been a history of violence between William and Chrisalena.

Based on this information, Deputy Bush accompanied Chrisalena to Plaintiff's home, told Plaintiff about the Texas court custody order, and asked whether William and Iris were at the house. Plaintiff told Deputy Bush that William and Iris had gone camping in Tennessee and that William had no cell phone with him.

---

Ian Geiman, and against all Defendants in their official capacity. None of these claims are before us on appeal.

[3] Plaintiff argues extensively that the Texas court custody order was undomesticated and, thus, unenforceable in Georgia.

3

The next day, Deputy Bush visited Iris's school and confirmed that Iris was absent again. When Deputy Bush told Chrisalena that William and Iris had still not returned from their camping trip, Chrisalena became upset and expressed concern about Iris's safety and about the possibility that William had run away with Iris. Chrisalena told Deputy Bush that, after she and William first separated, William took Iris from Texas to Georgia and refused to return her. Chrisalena also told Deputy Bush that William used illegal drugs and was involved in a satanic cult that valued the sacrifice of children and of a child's virginity.

When Deputy Bush returned to Plaintiff's home, Plaintiff told Deputy Bush that Plaintiff still had not spoken to William. Plaintiff then allowed Deputy Bush to look inside William's room, where Deputy Bush saw several satanic pictures and books and a schedule for a nearby satanic conference.

At that point, Deputy Bush contacted park rangers for the campground where William and Iris had supposedly gone camping. After conducting a search, the park rangers reported to Deputy Bush that they had been unable to locate William or Iris.

Meanwhile, another officer learned that Plaintiff's ten-year-old daughter, McKenzie, had told school counselors that Iris had not gone camping and, instead, was staying with a woman named Amanda. School officials also reported to

4

Investigator Farlow that McKenzie (who has an autism spectrum disorder) was capable of interacting with people and was known to be truthful.

After learning from Plaintiff that McKenzie was at a friend's house, Deputy Bush and Investigator Farlow went to the friend's house to speak with McKenzie. When Investigator Farlow asked McKenzie about Iris's location, McKenzie replied, "My mom doesn't want anybody to know." McKenzie also told Defendants that Plaintiff did not want Chrisalena to have custody of Iris, that Plaintiff had told McKenzie not to tell anyone where Iris was, and that William had called Plaintiff the last two nights. Based on her conversation with McKenzie, Investigator Farlow concluded that Plaintiff knew where Iris was, had lied to Defendants about Iris's whereabouts, and had instructed McKenzie to lie to Defendants. When Plaintiff arrived at the friend's house, Defendants arrested her for obstruction.

We review de novo a district court's grant of summary judgment based on qualified immunity, "drawing all inferences and viewing all of the evidence in a light most favorable to the nonmoving party." Gilmore v. Hodges, 738 F.3d 266, 272 (11th Cir. 2013).

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly

5

established statutory or constitutional rights of which a reasonable person would have known.'" Vinyard v. Wilson, 311 F.3d 1340, 1346 (11th Cir. 2002). A defendant asserting a qualified immunity defense must first show that she was engaged in a "discretionary function" when she performed the complained-of act. Holloman v. Harland, 370 F.3d 1252, 1263-64 (11th Cir. 2004). The burden then shifts to the plaintiff to show that the defendant is unentitled to qualified immunity. Id. at 1264.

As an initial matter, Defendants were engaged in a discretionary function when they arrested Plaintiff. A government employee engages in a "discretionary function" when she (1) performs "a legitimate job-related function" (2) in an authorized manner. Id. at 1265. "[T]o pass the first step of the discretionary function test for qualified immunity, the defendant must have been performing a function that, *but for* the alleged constitutional infirmity, would have fallen with his legitimate job description." Id. at 1266 (emphasis in original). Here, the general act of arresting a suspect is clearly part of Defendants' job-related powers and responsibilities.[4] See id. (noting that, in an excessive force case, "there can be

[4] Plaintiff argues that Defendants were not engaged in a discretionary function in part because Defendants had no discretion to enforce an undomesticated, out-of-state court order. For purposes of our "discretionary function" analysis, however, we look only to the general nature of Defendants' acts (here, the act of arresting a suspect), not to whether Defendants' acts were, in fact, lawful. See Holloman, 370 F.3d at 1266. Moreover, Plaintiff appears to confuse the question of whether Defendants were engaged in a "discretionary function" for purposes of

6

no doubt that the police officer defendant was acting in his discretionary capacity when he arrested plaintiff"). And nothing evidences that Defendants carried out Plaintiff's arrest in a way that exceeded the range of their discretion or in an otherwise unauthorized manner.

The burden now shifts to Plaintiff to show that Defendants violated a federal right and that the federal right was clearly established at the time of the alleged offense. See id. at 1264. "An arrest made with probable cause . . . constitutes an absolute bar to a section 1983 action for false arrest." Ortega v. Christian, 85 F.3d 1521, 1525 (11th Cir. 1996). An officer has probable cause to arrest "if the facts and circumstances within the officer's knowledge, of which he has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed or is committing an offense." Id.

"To receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Brown v. City of Huntsville, 608 F.3d 724, 734 (11th Cir. 2010). "Arguable probable cause exists where 'reasonable officers in the same circumstances and possessing the same knowledge as the

---

qualified immunity with the entirely separate question of whether Defendants were acting within their "lawful authority" for purposes of establishing probable cause to arrest Plaintiff for obstruction under Georgia law.

7

Defendants could have believed that probable cause existed to arrest Plaintiff." Id.

"Whether an officer possesses probable cause or arguable probable cause depends

on the elements of the alleged crime and the operative fact pattern." Id. at 735.

Under Georgia law, a person commits misdemeanor obstruction of an officer

when he "knowingly and willfully obstructs or hinders any law enforcement officer

in the lawful discharge of his official duties." O.C.G.A. § 16-10-24.  To be guilty

of obstruction, a person need not have engaged in violence or forcible resistance.

See Pinchon v. State, 516 S.E.2d 537, 538 (Ga. Ct. App. 1999).  Instead, the

Georgia courts have said that the obstruction element may be satisfied by conduct

such as "[a]rgument, flight, stubborn abstinence, and lying." Id.

Viewing the evidence in the light most favorable to Plaintiff, we conclude

that Defendants had probable cause to arrest Plaintiff for obstruction.  First, when

Plaintiff was arrested, Defendants were engaged in the lawful discharge of their

"duty to preserve public order, to maintain the peace, and to protect lives, persons,

property, health and morals." [5]  See Harris v. State, 622 S.E.2d 905, 907 (Ga. Ct.

App. 2005).  For two days, Defendants attempted unsuccessfully to locate William

---

[5] We reject Plaintiff's assertion that Defendants were not engaged in the lawful discharge of their duties because they were attempting to enforce an undomesticated -- and, thus, unenforceable -- custody order.  The actual enforceability of the Texas court order has no bearing on the outcome of this appeal.  Nothing evidences that Defendants acted (either in investigating Iris's whereabouts or in arresting Plaintiff) solely in reliance on the Texas court order or that Defendants attempted to enforce that custody order.  Instead, the record shows that Defendants acted (based on all the facts and circumstances within their knowledge), to maintain the peace and to ensure Iris's health and safety.

8

and five-year-old Iris.  Based on the information available to Defendants at the time -- including that William and Iris had traveled out-of-state, that William could not be reached by phone, that William and Iris could not be located at the campground where they were supposed to be staying, that Iris had been absent from school, that William had once before taken Iris and refused to return her to her mother, and that William was involved with illegal drugs and satanic worship -- Defendants concluded reasonably that Iris was in potential danger and that they owed a duty to maintain the peace and to ensure Iris's health and safety.

A prudent officer possessing the same knowledge as Defendants could have believed reasonably that Plaintiff lied to Defendants about Iris's true whereabouts and, thus, obstructed Defendants' efforts to carry out their official duties.  See Pinchon, 516 S.E.2d at 538.  Ample evidence indicated that Plaintiff had been untruthful with Defendants.  William and Iris could not be found at the campground where Plaintiff said they were.  School attendance records contradicted Plaintiff's contention that William frequently took Iris out of school to go camping.  Despite Plaintiff's insistence that she could not reach William, Defendants had reasonably trustworthy information that Plaintiff had, in fact, spoken with William at least twice in the past two days.  And, based on Defendants' conversation with McKenzie, Defendants had reason to believe that

9

Plaintiff did not want anyone to know about Iris's true location and had instructed McKenzie not to tell.

Because we conclude that Defendants had probable cause to arrest Plaintiff for misdemeanor obstruction, Plaintiff's false arrest claim fails as a matter of law.[6] See Ortega, 85 F.3d at 1525.  As a result, because no underlying constitutional violation has been shown, Plaintiff's conspiracy claim also fails.  See Grider v. City of Auburn, 618 F.3d 1240, 1260 (11th Cir. 2010) (to state a section 1983 claim for conspiracy, a plaintiff must show, among other things, that the alleged conspiracy "resulted in the actual denial of some underlying constitutional right."). Defendants are entitled to summary judgment.[7]

---

[6] We reject Plaintiff's argument that the district court erred in not addressing whether arguable probable cause existed to arrest Plaintiff for interference with custody or for tampering with evidence after the district court concluded that arguable probable cause existed to arrest Plaintiff for obstruction.  See Devenpeck v. Alford, 125 S.Ct. 588, 594 (2004) (an officer's "subjective reason for making the arrest need not be the criminal offense as to which the known facts provide probable cause"); Durruthy v. Pastor, 351 F.3d 1080, 1090 n.6 (11th Cir. 2003) (an officer is entitled to qualified immunity if he has probable cause to arrest the suspect for any offense).  Moreover, to the extent that Plaintiff attempts -- for the first time on appeal -- to assert a malicious prosecution claim against Defendants, we will not consider this claim.  See Access Now, Inc. v. Sw. Airlines Co., 385 F.3d 1324, 1333 (11th Cir. 2004).

[7] Because we have determined that probable cause existed to arrest Plaintiff for obstruction and, thus, no Fourth Amendment violation occurred in this case, we necessarily conclude that Defendants had arguable probable cause to arrest Plaintiff and violated no clearly established constitutional right.  Thus, even to the extent that a constitutional violation in fact occurred (which we reject), Defendants are still entitled to qualified immunity from Plaintiff's claims against them in their individual capacities for false arrest and for conspiracy.  See Vinyard v. Wilson, 311 F.3d at 1346 (government officials acting within the scope of their discretionary authority are immune from individual civil liability if the officials' conduct violates no "clearly established statutory or constitutional rights of which a reasonable person would have known.").

AFFIRMED.

11